## Case No. 17,543.

### WHITE v. COLORADO CENT. R. CO.

[5 Dill. 428;[1] 3 McCrary, 559; 17 Am. Law Reg. (N. S.) 783.]

Circuit Court, D. Colorado. July, 1879.

LIABILITY OF WAREHOUSEMEN—NEGLIGENCE—EXPLOSIVE SUBSTANCES.

1. A railroad company which keeps a warehouse for storing goods carried over its line until they shall be called for by the consignee, in respect to goods so carried and stored in its warehouse is regarded as a bailee for hire, and is required to exercise the care and diligence of ordinary warehousemen in keeping such goods.

2. Putting a large quantity of powder (one hundred and sixty kegs) in the same warehouse with plaintiff's goods was negligent conduct, for which defendant is liable in damages to the extent of the loss resulting to plaintiff from the presence of such powder in the warehouse.

3. A fire occurring in defendant's warehouse, where plaintiff's goods were stored, there being a large quantity of powder in the same house, if the firemen who resorted to the place for the purpose of extinguishing the fire were, by the presence of powder in the house, hindered and prevented from saving plaintiff's goods, the powder may be regarded as the proximate cause of the loss.

[Cited in brief in Adams v. Missouri Pac. R. Co., 100 Mo. 560, 12 S. W. 637, and 13 S. W. 509. Cited in Green Ridge R. Co. v. Brinkman, 64 Md. 62, 20 Atl. 1024.]

4. In such case the question of negligence is not for the jury, and the jury may be instructed that the storing of powder in the same house with plaintiff's goods, such house being located in a city where there was danger from fire, is negligent conduct on the part of the defendant.

This cause was tried before HALLETT, District Judge, and a jury. A verdict for the defendant was returned. The following opinion was delivered on the plaintiff's motion for a new trial.

Charles & Dillon, for plaintiff.
Teller & De France, for defendant.

HALLETT, District Judge. On the 1st of January last, plaintiff's intestate shipped a lot of dry goods and clothing from Georgetown to Denver over defendant's line. The goods were received at Denver and placed in defendant's warehouse on the morning of the 3d of the same month. Two days later they were destroyed by fire which originated in the building without fault of defendant. This action, in which plaintiff seeks to recover the value of the goods so destroyed, is founded upon an alleged liability of defendant to plaintiff as a common carrier and as a warehouseman.

As to the first count in the declaration, in which plaintiff sought to charge defendant as a common carrier, the jury have found against the plaintiff, and thus all questions arising on that count have been eliminated from the case. On the second count, in which defendant is charged with negligence as a warehouseman, the jury found for

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

plaintiff in the sum of $4,704.75, and the motion now to be considered is directed against that verdict.

It seems from the evidence that defendant's warehouse was a long wooden structure—one hundred feet or more in length—and that the company's offices for transacting its freight business were kept in one end of it. These offices were divided off from the main building by partitions, and the remainder of the building was used for storing goods. At about the center of the building, on each side, and communicating with the part which was used for storage, were large doors, through which the goods were passed when received into or taken out of the building. The plaintiff's goods, when received, were put in that end of the building which did not contain the office, and, of course, at some distance from the doors last mentioned.

By the same train which brought plaintiff's goods, a quantity of gunpowder, amounting to about one hundred and sixty kegs, was also received; and this powder was put by defendant in the same room with plaintiff's goods, but upon the other side of the doors before mentioned, and towards the offices, which were in that end of the building. So that, with reference to the doors which opened through the warehouse, it may be correct to say that the offices and the powder were in one end of the building, while the plaintiff's goods were in the other end of the same building. But the powder was, in fact, pretty near the door on that side where it lay, and between the offices and the plaintiff's goods.

The fire which destroyed the building and the goods, when first discovered, was in the roof immediately above the offices, and, of course, at some distance from the plaintiff's goods. Thus it appears that the fire was in one end of the building and the plaintiff's goods in the other, while the powder was between the fire and the goods, on the same side of the large doors before mentioned as the fire. This was the situation when members of the fire department arrived in considerable force on the ground with their apparatus, for the purpose of extinguishing the fire. The weather was cold, and some delay occurred before water was obtained, but three or four streams were soon brought to bear, so that, under ordinary circumstances, the flames might have been suppressed before half the building was destroyed. One witness testifies that there was an opportunity to cut off the fire at the large doors before mentioned, by carrying the water in at that place and playing on the fire from the inside.

But nothing of this kind was attempted, and, indeed, the firemen would not go within seventy or eighty feet of the building on the outside, because they feared injury from the powder. Some testimony was given at the trial to show that this fear was unfounded,

but if the experts who testified on that point had been present at the fire to explain the properties of gunpowder to the terrified firemen, it is doubtful whether the explanation would have been entirely satisfactory. The theory advanced is that metallic cans, in which the powder was put, are so expanded and cracked by the heat of a burning building that the powder escapes, and in that condition, if ignited, it produces only a flash in the pan, which is not at all dangerous to those who are outside of the building. If, however, one who is inside the building swallows the fire, as one of the witnesses said, it is deadly; so that even on this theory it was not safe to go into the building at the large doors before mentioned, for the purpose of suppressing the fire. So, too, a prudent person might well be excused from assuming that all of the cans would be cracked and laid open by the heat so as to render them harmless. Altogether, it may be said that this evidence does not prove, nor tend to prove, that the powder was not dangerous to life in the situation where it was found, but merely that the workmen might have approached the building more closely without danger to themselves. Whether they could have worked more effectively at a distance from the building of twenty-five or thirty feet than at a distance of eighty feet, does not appear, but may be a matter of reasonable inference. It does, however, appear that the gunpowder prevented the firemen from going in at the large doors before mentioned, with hose, and there operating against the fire. All the witnesses agree that this movement would, under the circumstances, have been full of danger, and it seems probable that it was not made for that reason. One witness testifies that he suggested it to the firemen, and was answered that it was dangerous to go there on account of the powder. Looking to the form of the building, the fact that it was built of wood, and the situation of plaintiff's goods with reference to the fire, it also seems probable that the goods would have been saved if the powder had not been stored in the building. Upon the evidence showing or tending to show that the loss of the goods was due to the presence of the powder in the warehouse, the court charged the jury as follows:

"As to the second cause of action, the liability of defendant, if any exists, depends upon the effect of storing powder in the warehouse, if any was stored there. You are advised that storing a considerable quantity of powder in the same house with plaintiff's goods was negligent conduct, and if the loss was occasioned by the presence of powder in the house, the defendant is liable. In order to fix such liability, however, it must appear to you from the evidence that the loss was certainly occasioned or produced by that cause. If those who were engaged in suppressing the fire would have

been able to save plaintiff's goods, and would have done so, if no powder had been kept in the building, the defendant may be held. But if this is a doubtful matter, and it is uncertain whether the presence of powder in the house occasioned the loss, the defendant is not liable. Upon that point you remember what the witness said about it, you determine as well as you can whether this loss certainly proceeded from that cause—from the presence of the powder. If it is doubtful in your mind, upon the evidence here, whether the loss was occasioned by that, that is to say, if, withdrawing the powder from the house, you think it still doubtful whether the goods would have been saved, the defendant cannot be held liable upon that. The only act of negligence, as it seems to me from the evidence here, was the putting of the powder there, and you must be able to ascribe that loss to that cause, and certainly to that, if you are to hold the defendant upon that. That is the position in which the matter stands."

That this principle is applicable to ordinary warehousemen, would appear to be beyond question. To store or deposit gunpowder in large quantities in any place in a city where it will endanger life and property, is a public nuisance. Cheatham v. Shearon, 1 Swan, 213; Myers v. Malcolm, 6 Hill, 292; [Hay v. Cohoes Co., 2 N. Y. 159].[2]

The case in 6 Hill shows that the party storing the powder will be liable for any damage that may result from it. And the same view is expressed in some of the textbooks. 1 Add. Torts, 308; Wood, Nuis. § 142.

Warehouses are usually, if not always, located in cities, where the danger from fire is great, and, of course, keepers of such houses must provide against the danger with reasonable care. It is often difficult to determine whether such care has been used, but no embarrassment is felt respecting the point now under consideration. With reference to warehousemen in general, we have only to ask whether a prudent man would store a large quantity of gunpowder in a building with other goods, in a populous city—whether that is the usual and ordinary course of business—to decide the question of negligence.

But it is said that a railway company which keeps warehouses for the convenience of the public, and as a necessary appendage to the business of a carrier, is not to be put upon the footing of ordinary warehousemen; that the company is not a warehouseman by choice, but through the negligence of its patrons, who will not take away their goods as soon as they are received at the company's depot; that as the company may lawfully carry all things, so may it lawfully store whatever it carries, and he who entrusts goods to its charge takes upon himself the risk of such storage. These

suggestions are not without weight, but it is believed that they ought not to prevail against the general rule which exacts from a bailee for hire reasonable diligence in the care of property entrusted to him. That a railway company, keeping the property of its patrons in its own warehouse for a reasonable time, until it shall be called for, is to be regarded as a bailee for hire, and not as a naked depository, is now fully settled. Norway Plains Co. v. Boston & M. R., 1 Gray, 273; Whart. Neg. § 478.

As such, no reason is seen for relieving it from the duties and responsibilities which attach to that character of bailment. It must be borne in mind that the company was not bound to carry the powder on its railway, and still less was it required to store so dangerous an article in its warehouse. Boston & A. R. Co. v. Shanly, 107 Mass. 575; Whart. Neg. § 856.

If the company was willing to incur the risk of carrying powder, it must be assumed that it was also willing to take upon itself the liabilities incident to such risk. So, also, it may be said the matter of storing the powder was disconnected from and entirely independent of the carrying. Although the company had carried the powder, it was not bound to put it in its warehouse. The consignee might have been required to take away the powder in the very hour of its arrival at Denver, or it might have been sent to some warehouse prepared and kept for storing such articles. Putting it in the warehouse of the company was a voluntary act, carrying danger to the property of others, and therefore wrongful in itself. That it was not an exercise of the reasonable care in preserving the plaintiff's property which the law enjoined, seems to be too plain for argument.

Another objection to the charge is that the powder, if at all instrumental in the destruction of plaintiff's goods, was not the proximate cause of that result. To support this objection, insurance cases are cited in which it has been held that loss occasioned by explosion of powder may be connected with the fire which ignited the powder as the proximate cause.

Hence, it is claimed that, in all such cases, the fire, and not the powder, is the proximate cause of loss. But there may be, and usually there is, more than one agency or means of producing loss. Take, for instance, the car loaded with oil which escaped from the company's servant and ran down a steep grade and came in collision with a locomotive, which set fire to the oil, and thence it was communicated to the plaintiff's house. The fire and oil united in the destruction of plaintiff's house, and the cause of all the mischief was a defective brake on the car. If there was negligence in respect to any one of these things, the person chargeable with such negligence was responsible for the loss. Oil Creek & A. Ry. Co. v. Keighron, 74 Pa. St. 316.

So, also, where dry grass was negligently

---

[2] [From 3, McCrary, 559.]

allowed to remain in heaps near defendant's railway, and fire was communicated to such heaps by a passing engine, and thence carried by the wind a distance of two hundred yards to plaintiff's cottage, which was destroyed, the defendant was held liable. Smith v. London & S. W. Ry. Co., L. R. 6 C. P. 14; Id. L. R. 5 C. P. 98. The fire was, of course, a cause of mischief, but the wind and dry grass were also efficient in communicating the fire to the building, and the negligence was in respect to the grass only. If defendant had set the grass on fire negligently, or (if that had been possible) had caused the wind to blow, it would have been liable for the loss in the same manner.

On the same principle, it was held in Massachusetts that one who negligently cut the hose with which water was supplied for suppressing a fire, was liable for the damage occasioned by his wrongful act. Metallic Compression Casting Co. v. Fitchburg R. Co., 109 Mass. 278.

There, as in the case at bar, it was contended that the proximate cause of loss was the fire, rather than the act of the defendant. But the court was of a different opinion; saying that when a man cuts off the hose "through which firemen are throwing a stream on a burning building, and thereupon the building is consumed for the want of water to extinguish it," his act is to be regarded as the direct and efficient cause of the injury.

In all these cases it may be said that the fire is a proximate cause of loss, but it does not follow that it is the only cause standing in that relation to the result. And so, while it is true that plaintiff's goods were in fact destroyed by fire, it is also true that the gunpowder in the warehouse, by keeping the workmen from the fire, may have contributed to the loss in such way as will make it a proximate cause. "Negligence may be the proximate cause of an injury of which it is not the sole or immediate cause." Shear. & R. Neg. § 10.

Without further discussion of what appears to be plain, we have no doubt the powder was near enough to the loss to make the defendant liable for its negligence in putting it in the warehouse, if, as the jury have found, it directly contributed to the result; and this objection must be overruled.

The defendant further relies on the form of the instruction, claiming that the question of negligence was improperly withdrawn from the jury.

It is not denied, and it cannot be successfully claimed, that where the facts are established, negligence may be an inference of the law to be decided by the courts. Shear. & R. Neg. § 11; Tarwater v. Hannibal & St. J. R. Co., 42 Mo. 193; Pittsburg & C. R. Co. v. McClurg, 56 Pa. St. 294. In some cases, as where the conclusion to be drawn is not direct and certain, the rule is otherwise ([Railroad Co. v. Stout] 17 Wall. [84 U. S.] 663); but here the facts lead in but one direction.

It was admitted at the trial that defendant's warehouse was in the city of Denver, and whether powder was stored there—although it was not denied—was submitted to the jury on the evidence. It is difficult to discover any other fact that entered into the question of negligence, unless it be the dangerous properties of powder, and perhaps that is the point in controversy.

In the argument of this motion at the bar, counsel were understood as saying that the testimony of witnesses at the trial had raised a doubt as to the effect of powder exploding in a burning building, and if the question to be decided should be as to the effect of such explosion on the building itself and the contents thereof, their position would not be untenable. The testimony tended to prove that neither the building nor the goods therein were much injured by the explosions. But this is not the point to which the evidence was directed. As before explained, the question was whether the firemen were reasonably deterred by the presence of the powder in the building from effective work in extinguishing the fire. And so far was the evidence from showing or tending to show that the firemen were not so deterred, that it tended rather to establish the inference of danger to life from the presence of that article, as least as to all those who should attempt to enter the building. So that the evidence referred to did not in any way affect the question of negligence, and if it bore on the other point, as to whether the firemen were in fact hindered from operating against the fire, that matter was submitted to the decision of the jury on the evidence.

Aside from this, I cannot believe that it is in any case necessary or proper to ask a jury to find whether gunpowder is a dangerous compound. The fact is of universal notoriety, familiar to all men, and needs neither finding nor proof to establish it. What would be thought of the demand for such proof in a prosecution for assault with attempt to kill and murder? Would it be said that the government must show that the gun was loaded with powder and ball, and that powder is an explosive substance capable of expelling the ball from the gun with great force, and so on. Generally, as to the negligence imputed to defendant, it may be said that the act was not to be affected by the circumstances attending it, and therefore it was not to be decided by the jury. If under any circumstances the storing of powder with other goods in a warehouse in a city would be a reasonable exercise of judgment and discretion, the rule would be otherwise; because, if the circumstances may give color to the act, and make that fair and unquestionable which otherwise must appear to be culpable, the jury would have to determine whether by the circumstances the act was relieved of the character ascribed to it. But such, it is believed, cannot be the rule as to any such misconduct. There was nothing in the evidence upon which the jury could say that the act of putting powder in the ware-

house was not negligence, and therefore there was nothing to be determined by them on that point, except the matter of putting it there, which was left to them to decide on the evidence.

Whether the presence of the powder in the warehouse was the direct and efficient cause of the loss, was not, as it could not be, conclusively shown; but the evidence on that point is regarded as sufficient to sustain the verdict. That was peculiarly a question for the jury. Milwaukee Ry. Co. v. Kellogg, 94 U. S. 474. We do not feel at liberty to disturb the verdict on that ground; and we have not been able to discover any error in any part of the record. The motion is denied.

Motion denied.

[The cause was carried to the supreme court on writ of error. The writ was dismissed for want of jurisdiction. 101 U. S. 9S.]